**E. M. FLEISCHMANN LUMBER CORP. v. RESOURCES CORP. INTERNATIONAL.**

Clv. A. No. 1086.

United States District Court
D. Delaware.

May 22, 1952.

William H. Foulk and Herbert L. Cobin, of Wilmington, Del., Robert F. Skutch, Jr., and Weinberg & Green, of Baltimore, Md., for plaintiff.

Horace Greeley Eastburn, of Wilmington, Del., and Leonard L. Cowan, of Chicago, Ill., for defendant.

RODNEY, District Judge.

An opinion was formerly filed in the above matter in which the conclusion reached by the court as to the issue of damages seems not to have taken into consideration the understanding of the parties resulting from the action or language of the court itself. Questions of liability were at that time to be determined by the court, leaving the general proof of damages to be later developed. After the former opinion was filed, the plaintiff moved for a rehearing or, in the alternative, for a partial new trial. This motion was granted and additional testimony taken.

No final order having been entered on the former opinion, this court now withdraws and nullifies the former opinion. A large measure of facts detailed in the former opinion are restated in this opinion which supersedes the former. Damages are only treated as necessarily involved in the facts and as a limitation in future proceedings.

This action is brought to recover damages alleged to have resulted from fraud or deceit practiced by the defendant upon the plaintiff.

The essential allegations of the complaint are as follows. Plaintiff acquired by assignment all rights in an option agreement given by defendant to C. B. Baker & Company and Murray A. Schutz on January 7, 1946, to cut the hardwood timber on a tract, known as the Manantlan tract, in the State of Jalisco, Mexico. The plaintiff and the defendant entered into negotiations with a view to carrying out the option agreement, and in the course of the negotiations defendant gave to plaintiff details of the topography of the tract, the location of the various types of timber on it, and other pertinent matters. In this connection representations are stated to have been made by the defendant to the plaintiff to the effect that cutting operations could and should be initiated on the lower level of the tract, and that there was enough hardwood timber on the lower level to cover the minimum annual advance payments to be made by the plaintiff to the defendant for four years under the terms of the proposed contract between the parties. It is further alleged that as a result of these negotiations the defendant knew that the plaintiff needed barrel staves immediately, and that the defendant represented and warranted that if plaintiff exercised the option, it would be able to cut timber immediately from the lower levels of the Manantlan tract for the plaintiff's immediate use.

It is then alleged in the complaint that the defendant represented and warranted to the plaintiff that since the option agreement of January 7, 1946, certain Indian communities having their habitation adjacent to the Manantlan tract had instigated a dispute with respect to the true boundaries of the tract, but that the dispute was considered to affect title to only the fringe of certain sections of the tract; and that the defendant also represented and warranted to the plaintiff that the dispute would in no event prevent the immediate carrying out of operations as contemplated by the parties and that there was nothing to be alarmed about in the asserted claims of the Indians.

Plaintiff avers that in reliance upon these representations and warranties, it was induced to continue negotiations with and to enter into certain contracts with defendant and its agents and nominees; that the statements and representations were false and were known by the defendant to be false and were made by the defendant with the intention that the plaintiff should rely

thereon; and that plaintiff did rely thereon to its injury and damage, for which it claims the sum of $2,500,000 from the defendant.

The defendant in substance denies in its answer the allegations of false representations and avers that the plaintiff relied on information given to it by its own agents and employees.

At the trial it was agreed by counsel for both parties, with leave of court, that the presentation of evidence relating to the issue of damages would be deferred until the issue of liability should have been determined. Extensive evidence, both oral and documentary, was taken on the latter issue.

Although the quantity of evidence before the court is great and some of that evidence, relating as it does to administrative and legal proceedings which took place in Mexico, is not entirely free from obscurity, the cardinal issues of fact seem to be relatively clear and limited in their scope. The statement and discussion of the facts, which follows, will therefore be confined to those that are pertinent to the cardinal issues.

The defendant, Resources Corporation International, is a Delaware corporation, organized in 1931. It owns or controls extensive properties in various parts of Mexico. Among these properties is one situated in the State of Jalisco, containing, according to the defendant's title papers or maps, about 48,000 acres and known as "Manantlan y Anexas." This property is in the municipality of Autlan and is located in hilly or mountainous country. Topographically it seems to be divided roughly into two zones. One zone, covering about half the property, and consisting of the southerly and southwesterly part, rises from lower ground to the rim or top of certain mountains. The other zone lies on a plateau running back in an easterly direction from the top of these mountains. The zone first referred to has been generally called in the course of the trial the "lower levels" or "lower elevation." Adjacent to the southerly and southwesterly boundaries of defendant's Manantlan property lie the communal lands of two Indian communities known as Cuzalapa and Ayotitlan. It is with the claims of these Indian communities to land included in the Manantlan property that this action is very largely concerned. Record title to the Manantlan tract was held by a Mexican lawyer named Antonio Correa, but the property was controlled by Resources. During the times with which we are concerned, the vice-president and general manager of the defendant was Arnold Joerns and James Barker was Mexican manager for Resources.

E. M. Fleischmann is the president, and a director and stockholder of the plaintiff. He has been in the distillery business for many years, except during the prohibition period. During the war the distillation of beverage whiskey was prohibited for a time, and cooperage concerns consequently stopped making whiskey barrels. When it again became possible to distill whiskey, in August, 1944, an acute shortage of barrels and of staves for making barrels developed almost immediately. Distilleries began to buy up cooperage concerns, as well as timberlands or timber rights in order to obtain the staves necessary to make barrels. This practice was followed by the Fleischmann interests.

Fleischmann first heard of the Manantlan tract in October, 1945, when he was told by Fred Metzger of C. B. Baker & Company, whiskey brokers, of the possibility of obtaining lumber suitable for staves from the tract. Joerns had written a letter to Metzger in September, 1945, describing the tract. This letter was written in response to an inquiry from Metzger based on Joerns' understanding that C. B. Baker & Co. was "interested in working out a deal for staves for one of your large contracts." In this letter the distribution of various species of trees on the tract was adverted to, and it was stated that most of the oak, ash and walnut was in the lower elevations, while the high plateau area was mostly pine. It was also stated that the white oak had been tested by leading bourbon stave manufacturers and had been found to be of excellent quality. This letter was sent on to Fleischmann by Metzger in October, 1945. Fleischmann showed definite interest in the possibility of acquiring

timber rights in the Manantlan tract, and as a result an option agreement was entered into on November 6, 1945, between Resources on the one hand and C. B. Baker & Company and a certain Murray Schutz on the other hand relating to the acquisition of such rights.

Fleischmann wished to have the property examined more thoroughly. Accordingly three men were sent down to the Manantlan tract for that purpose. One was Harlan A. Burbank who was recommended to C. B. Baker & Co. by Joerns as a lumberman; the others were Porter, who was to report on the matter of building a road into the tract, and Shuh, who was a stave man. Burbank had had some previous experience with the Manantlan tract, having operated there in 1942 and having supervised the building of a portion of a proposed road leading to the tract. That operation, it appears, was abandoned before the cutting of lumber had begun. These men rendered a favorable report on the tract. Subsequently a conference was held in New York at the end of December, 1945, attended by Fleischmann, Klotzmann, who was a vice-president of the various Fleischmann concerns, Metzger and Joerns. The terms of a new option agreement for timber rights on the Manantlan tract, such rights to include all the hardwood, were worked out and this agreement was executed under date of January 7, 1946. In the course of the negotiations leading up to the execution of this new option agreement Joerns informed Fleischmann that a Cuban national named Martin and his associate and manager, Perez, had taken an option for all the soft woods on the Manantlan tract. It is also claimed that Joerns stated that the hard woods on the lower levels were available for immediate exploitation.

In April, 1946, Barker and Joerns became aware, through information given by Perez, who had begun to operate on the lower elevations of the Manantlan tract near a village called Durazno, that the neighboring Indian communities were making the claim that the land upon which Perez was commencing his operations belonged to them. When Burbank went down to Mexico in that month, he was informed by Barker of the Indian claims. Exactly how much information concerning the Indian claims Barker and other representatives of Resources then had, and how much of that information was conveyed to Burbank in April, 1946, is a matter of controversy between the parties.

After further correspondence and preliminary negotiations between the parties, a conference was held in Mexico City towards the end of June, 1946, looking to the consummation of a definitive contract between Resources, or its Mexican title holder, and Fleischmann. This conference was attended by Fleischmann and Burbank, who was now in the employ of the plaintiff, and various members of the law firm of Hardin and Hess, who represented the plaintiff, and who had offices in Mexico City. For Resources, Joerns and Barker were present, assisted by various members of the law firm of Basham, Ringe and Correa, also of Mexico City. After several days of negotiation the terms of a definitive contract were agreed upon. It was understood that, in order to conform to the requirements of Mexican law, the plaintiff would cause a Mexican corporation to be formed for the purpose of executing the contract and carrying it out, which corporation would be virtually wholly owned by the plaintiff.[1] The contract itself was to give the newly formed Mexican corporation the right to purchase cut timber from the Manantlan tract for a period of twenty years, upon the payment of certain sums of money at agreed periods. The contract recited that Antonio Correa held title to the Manantlan tract, and the bounds of the tract were described in considerable detail. A clause was inserted in the contract, known as Clause 17(b), in which it was recited that the Indians had "instigated a dispute" regarding the Manantlan boundaries, but that the claims of the Indians were considered not to affect more than five per cent of the area of the tract. It is plaintiff's contention that when these Indian claims were discussed during

---

1. This corporation was duly formed and is herein spoken of as "Maderera Occidental, S.A."

the negotiations, Joerns or Barker or both represented that they were not serious, were minor in nature and would not interfere with plaintiff's lumber operations.

After the conclusion of the negotiations, Fleischmann's Mexican lawyers were instructed to examine Resources' title to Manantlan, and arrangements were made to have the Mexican subsidiary formed to execute the contract on behalf of the plaintiff and to have the contract translated into Spanish, so that it could be executed in Mexico City. After some delay the contract was in fact executed with due formality, the parties to it being Correa on the one hand, and the Mexican corporation, Maderera Occidental, S.A., on the other. The date of the contract was August 19, 1946, although it appears that the actual date of execution was some ten to fifteen days later. At the same time a cutting contract was entered into between Antonio Correa and a certain Galindo, of the law firm of Hardin and Hess, acting for the plaintiff. The parties to this suit severally guaranteed the carrying out of these contracts.

Thereafter, the Mexican corporation set up its organization for the purpose of exploiting the timber, and began work on the construction of a road. In December, 1946, the preliminary work having progressed to what was deemed a satisfactory stage, Correa, as defendant's representative, signed an application, at the request of Burbank, for a permit from the Mexican government to cut and remove timber from the tract. This application was refused by the Forestry Department of the Mexican government because of certain claims of the Indians to parts of the tract. Thereafter, lumbering operations were held in suspense pending the clarification of the dispute with the Indians. Finally, in July, 1947, the defendant, acting through Correa, instituted a proceeding before a local court, in the State of Jalisco, known as an "apeo y deslinde" proceeding, meaning a legal survey and demarcation proceeding. In this proceeding the boundaries claimed by Correa were upheld by the local court and the Indian claims were in effect rejected on the ground, it appears, that the Indians failed or refused to produce to the court the documents upon which they based their claims. Thereafter an application was again made to the Mexican government for permits to cut timber on the Manantlan tract. This application was denied, on the ground that the Indian communities concerned had not been properly represented at the "apeo y deslinde" proceedings. Further legal proceedings known as "amparo" proceedings, were instituted in Mexico City by Correa for the purpose of having the decision in the "apeo y deslinde" proceeding recognized and given effect by the Forestry Department. Correa was successful in the "amparo" proceedings. This occurred in or about November, 1947.

In the meantime, that is, very shortly after the apeo proceedings, the plaintiff, or those acting in its interest, had come across a certain map of the Manantlan area in the files of the offices of the Federal Department of Agriculture at Guadalajara, State of Jalisco. This map had been prepared in December, 1946, and allegedly indicated that the claims of the Cuzalapa and Ayotitlan Indians covered the lower levels of the Manantlan tract, embracing approximately half the area claimed by the defendant as its Manantlan property. As a result of this discovery and of the continued failure to obtain the necessary cutting permits from the Forestry Department, suit was instituted in August, 1947, by Maderera Occidental, S.A., against Correa for breach of the contract of August 19, 1946. Operations on the road to the Manantlan tract were brought to a close, and the present suit was instituted in December, 1947.

Such, in outline, is the factual background of this case. In order to prove its charges of fraud, plaintiff relies on three main factual contentions: (1) that the defendant falsely represented that the claims of the Indian communities of Cuzalapa and Ayotitlan covered only a very small part, not more than 5%, of the Manantlan tract, were minor in character and were not serious, whereas in fact the Indian claims extended to approximately half the tract and were serious in nature and this fact was known to the officers and employees of defendant concerned in the negotiations, prior to the execution of the contract of August

19, 1946; (2) defendant failed to disclose to plaintiff in the course of the negotiations leading up to execution of the contract and thereafter that Perez' cutting operations on Manantlan had been brought to a standstill because of the Indian claims; (3) defendant prevented and discouraged plaintiff from effectually investigating the extent of the Indian claims.

Defendant not only denies the making of any false and fraudulent representations to the plaintiff, but contends that it gave the plaintiff such information as it had and that the plaintiff acted entirely upon its own investigation and knowledge.

■ I am convinced that the three factual contentions of the plaintiff as just above outlined have been supported by the evidence. They are not here elaborated, being set forth in the findings of fact filed herewith.

The defendant, however, contends that the present plaintiff is not the proper party plaintiff in this suit and has no cause of action. This latter contention raises a question that must now be considered.

■ Both parties have relied upon the case of Nye Odorless Incinerator Corporation v. Felton, 5 W.W.Harr. 236, 162 A. 504, 510, as laying down the general rule of law applicable to this suit. There the court said:

"In order to support an action of this kind [fraud], it is necessary for the plaintiff to satisfy the jury by preponderance of the evidence, (1) that the defendant made a substantial, material representation respecting the transaction; (2) that it was false; (3) that when he made it he knew that it was false; (4) that he made it with the intention of inducing the plaintiff to act upon it; (5) that the plaintiff was misled thereby and in reliance thereupon, did act upon it, and it thereupon suffered damage."

It is the defendant's position that while the representations regarding the Indian

claims were made, in the first instance at least, to the plaintiff or its officers and agents, the damage suffered as a result of reliance thereon was suffered not by the plaintiff, but by the Mexican corporation, Maderera Occidental, S. A., the real party to the contract, and that consequently the present plaintiff has no cause of action against the defendant.

■ It is quite clear in the present case that the representations made by the defendant were made to be acted upon not only by the plaintiff, but by a party standing in stead of the plaintiff for the purpose of executing and carrying out the proposed contract. The question whether under circumstances such as these a new corporation, created for the purpose of succeeding to the rights of the promisee having acted to its detriment in reliance upon the representations, may maintain an action of deceit, has been before the courts on several occasions. The general consensus of opinion among the authorities appears to be that the newly organized corporation has a right against the misrepresentor upon the principle that where misrepresentations are made to one person, with the intention that they be communicated to another, and acted upon by such other, and as a fact such representations are communicated and acted upon to the prejudice of that other person, an action of deceit will lie.[2]

These authorities do not directly or specifically pass upon the question whether the organizers or promoters of the corporation also have a right of action against the misrepresentor. However, some of the cases contain statements of general principles which in my opinion have close application. Thus in Schoefield Gear & Pulley Co. v. Schoefield, 71 Conn. 1, 40 A. 1046, 1050, in an action by a corporation subsequently formed, the court said:

"If, therefore, the defendant fraudulently told the five individuals named in the complaint what is there alleged, in order to induce them to form the plaintiff corporation, and procure the execu-

2. Nye Odorless Incinerator Corp. v. Felton, 5 W.W.Harr. 236; 162 A. 504; Schoefield Gear & Pulley Co. v. Schoefield, 71 Conn. 1, 40 A. 1046; Iowa

Economic Heater Co. v. American Economic Heater Co., C.C., 32 F. 735; Crystal Pier Amusement Co. v. Cannan, 219 Cal. 184, 25 P.2d 839, 91 A.L.R. 1357.

tion by it of the contract which was the subject of their negotiation with him, and if, thereupon, in reliance on his statements, they did the very things which his representations were designed to promote or secure, the fact that the last step—the execution of the contract—was, in form, the act of a party with which he never had any direct communication, cannot relieve him from responsibility for all the damage naturally resulting from his fraud. So far as concerns the individuals with whom his negotiations were conducted, each of them has his several action for whatever injury he can show. So far as concerns the corporation, it has also its action for whatever injury it can show. * * *"

Likewise, in Crystal Pier Amusement Co. v. Cannan, 219 Cal. 184, 25 P.2d 839, 91 A.L.R. 1357, it was held that a corporation which was organized after the making of the false representations to the officers and directors of another corporation, could maintain an action of deceit, since the newly organized corporation was intended to act upon the false representations. As both the old and the new corporations were parties plaintiff to the action, the California Supreme Court did not pass upon the precise nature of the original corporation's right, if any, as against the defendant, but nevertheless implied that it would generally have been entitled to recover for the loss suffered individually by it, prior to the time of the organization of the new corporation.[3]

■ I am of the opinion that the general conclusion to be drawn from these authorities, stated in terms applicable to the present action, is that the plaintiff, Fleischmann Lumber Corporation, may maintain an action only to recover the damage proximately suffered by it and not for the damage proximately suffered by Maderera Occidental, S. A., absent special circumstances which may warant a disregard of the corporate entity or a finding that the latter

corporation was merely an agent of the former.

■ The complaint in this case seeks damages in the total amount of $2,500,000 and specifies three categories of damages making up approximately this total as follows: (a) for payments under the contract and preparations for operations under the contract; (b) for loss of profits which would have been made between January and July, 1947; and (c) loss of future profits. It seems clear, however, that some of the categories of damages relate in fact to damages suffered by Maderera Occidental, S. A. and actually claimed by it in a suit brought under this very contract. Although detailed evidence regarding damages was not introduced at the trial, some of the facts appeared in the financial statement of Maderera dated October 31, 1947. The organization expenses and pre-operating expenditures and payments under the contract appear on this balance sheet, but it is difficult to see how they could have been actually paid by that corporation prior to the time it came into existence. If these amounts were actually paid by the plaintiff, the mere fact that the items appear on the balance sheet of Maderera ought not to prevent the plaintiff from claiming redress because of these payments made by it.

As far as loss of profits is concerned, it seems reasonably clear that only Maderera Occidental can be concerned directly with profits which might have accrued from operations under the contract made by Maderera and for which contract Maderera Occidental was specially formed. The Fleischmann Lumber Corporation can have no right of action in that respect simply by virtue of being a stockholder and creditor of the allegedly defrauded corporation.

I am informed in this case that a suit is now pending in Mexico, or was when testimony in this case was taken. The plaintiff in that suit was Maderera Occidental and it sought, with the knowledge of Fleischmann Lumber Corporation, to recover all damages resulting from loss of

3. In the present case opportunity was given to the plaintiff to join herein as a plaintiff Maderera Occidental, S.A., which had instituted in Mexico an independent action, so that all parties allegedly injured would have been present in this suit. Such joinder has not been had.

profits in connection with the contract in question. It is difficult to see how a recovery of these profits in this case by Fleischmann would be a bar to a recovery in that suit by the actual corporation suffering the damage.

Thus far E. M. Fleischmann Lumber Corporation and Maderera Occidental, S. A., have been considered as though they had been two separate corporate entities, having no connection whatsoever with each other. The plaintiff contends, however, that Maderera was a mere tool instrumentality or agent of Fleischmann, and that the corporate entity should therefore be disregarded.

Both parties appear implicitly to agree that Maderera Occidental, S. A., is a corporate body having essentially the same attributes and qualities as a corporation or company in our jurisprudence. Nothing appears furthermore to indicate that it could not bring suit here or elsewhere for the wrong, if any, done to it by the defendant. Indeed, it seems that it has already brought suit for this same wrong against Correa in Mexico, and seeking precisely the same damages as are here sought. I think that it may reasonably be assumed, therefore, it has capacity to sue in its own name to recover for wrongs done to it.

There can be no question that Maderera was brought into being by Fleischmann for the express purpose of entering into the contract with defendant's title holder, Correa. It is also clear that the Fleischmann Lumber Corporation is either beneficially or legally the owner of all or virtually all of the stock of Maderera; that it has control of Maderera and that Maderera is heavily indebted to the Fleischmann corporation. On the other hand there is no suggestion that Maderera is a sham or that it was organized for fraudulent or illegal purposes. On the contrary, its organization was prompted by a desire to meet the requirements of the laws of Mexico, in which country the operations under the contract were to be carried out. Under these circumstances, may the parent corporation sue for wrongs done its subsidiary?

The general rule has been stated to be that for wrongs done to a corporation the action resides exclusively in the corporation itself and not in the stockholders. In Green v. Victor Talking Mach. Co., 2 Cir., 24 F.2d 378, 380, 59 A.L.R. 1091, it was held that "even when all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons. Therefore, even a sole shareholder has no independent right which is violated by trespass upon or conversion of the corporation's property."[4] The reason underlying the general rule, requiring the action to be brought by the corporation, even when the stockholder dominates the wronged corporation, is not only that such a single action will avoid a possible multiplicity of suits by various stockholders and will act as a bar to a subsequent suit by the corporation, but also that the damages so recovered may be available for the payment of the corporation's creditors as well as for distribution to the stockholder or stockholders.[5]

These principles stem simply from a particular application of the concept of the corporate body as an entity distinct from its members, whether they be many or one. In case of Owl Fumigating Corporation v. California Cyanide Co., D. C., 24 F.2d 718, 719, affirmed 3 Cir., 30 F.2d 812, it was said that the law "is well settled that ownership alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of

---

4. See also: Sigl Inc. v. Bresnahan, 216 App.Div. 634, 215 N.Y.S. 735; Barkers Creek Coal Co. v. Alpha-Pocahontas Coal Co., 1924, 96 W.Va. 700, 123 S.E. 803; Belle City Malleable Iron Co. v. Clark, 1927, 172 Minn. 508, 215 N.W. 855; Paramount Famous Corp. v. Stinnett, Tex. Civ.App., 17 S.W.2d 125, affirmed, Tex. Com.App., 37 S.W.2d 145.

5. Massachusetts v. Davis, 1942, 140 Tex. 398, 168 S.W.2d 216; certiorari denied 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848, rehearing denied 320 U.S. 811, 64 S.Ct. 31, 88 L.Ed. 1848.

principal and agent, representative, or alter ego between the two. * * * Yet it is equally well settled that, upon an inquiry into the legal relationship between two corporations, stock ownership, common officers, and the relation of debtor and creditor are facts not to be ignored, for, if by these means, or otherwise, the subsidiary company becomes a mere agency or department of the holding company, or is used as a blind or instrumentality to perpetrate fraud, justify wrong, defend crime, or defeat public convenience, the holding company cannot escape liability for the acts of the subsidiary." Normally the question of identity between parent and subsidiary corporations arises when the imposition of liability on the parent for the acts of the subsidiary is involved. The rule for disregarding the corporate entity is of equitable origin,[6] and the reason for its application when the parent corporation is attempting to do wrong or to escape the possible consequences of fraudulent or illegal actions by employing the instrumentality of a wholly-owned and completely dominated subsidiary, is quite clear. Where, however, a corporation or an individual has organized another corporation to carry on a particular operation, the reasons for permitting the parent corporation to disregard for purposes of suit the separate entity of the wholly-owned subsidiary corporation are not apparent. To permit the parent corporation to do so for the purpose of bringing suit upon a cause of action belonging to the subsidiary, in the absence of compelling reasons, would simply be creating further uncertainty in a field of law which is already sufficiently uncertain. In my opinion, this case does not present such exceptional circumstances as to warrant a disregard of the corporate entity.

 The plaintiff contends, nevertheless, that Maderera was in fact an agent of Fleischmann Lumber Corporation. I am satisfied by the evidence, however, that no true agency relationship existed between the two corporations. Certainly the contract between Maderera and Correa was not entered into by Maderera as agent for Fleischmann. The evidence indicates rather clearly that care was taken to operate and maintain Maderera as a separate entity. The fact that Fleischmann guaranteed Maderera's performance under the contract would seem further to negative the existence of an agency relationship, and this is still further proven by the fact that Maderera Occidental, S. A., in a suit against Correa with the knowledge and approval of Fleischmann Lumber Corporation, the present plaintiff, has and, so far as appears, still claims as its own the loss resulting from the actions of the defendant.

My conclusion, therefore, is that the present plaintiff has a cause of action to recover such damages as were suffered by it and provable under the limitations of this opinion.

---

6. 1 Fletcher Cyc. Corporations, 138, Sec. 41.