UNITED STATES of America

v.

**0.01 ACRE OF LAND, MORE OR LESS, Situate IN CECIL COUNTY, STATE OF MARYLAND, and Paul W. Quigley et al.**

**Civ. A. No. 18084.**

United States District Court,
D. Maryland.

March 23, 1970.

Stephen H. Sachs, U. S. Atty., Theodore R. McKeldin, Jr., Asst. U. S. Atty., for the District of Maryland, Baltimore, Md., and Philip M. Zeidner, Malcolm D. Hawk and Harris Grimsley, Attys., for the U. S. Dept. of Justice, Washington, D. C., for plaintiff.

W. Pepper Constable and Thomas F. Comber, III, Constable, Alexander & Daneker, Baltimore, Md., for defendants Paul W. Quigley and Eva F. Quigley, his wife, and Elk Forest Civic Association.

WATKINS, District Judge.

The United States Government filed the above entitled condemnation case and among others, defendants Paul W. Quigley and Eva F. Quigley, his wife, were served with notice, which notice advised them that if they had any objection or defense to the taking of the property herein involved they should file an answer within 20 days; that if they had no objection or defense to the taking, they could serve upon plaintiff's attorney, a notice of appearance so that they would thereafter receive notice of all proceedings affecting the property; and that whether or not they filed an answer or served a notice of appearance, they would be entitled to present evidence as to the amount of compensation allegedly due them at the trial of the issue of just compensation. Thereafter within the 20 day period Mr. and Mrs. Quigley each wrote separate letters to the United States Attorney for the District of Maryland advising him that "there are objections to the condemnation of 0.01 acre of land in Elk Forest, Cecil County, State of Maryland" and that they would appreciate receiving notice of all proceedings affecting said property. However, no formal answer was filed on their behalf within the allotted time. The Quigleys then employed counsel, and counsel after reviewing the pleadings petitioned for leave to file an answer. Leave was granted by the court; the answer was filed; and the Government in turn filed an amendment to the complaint and moved to strike the answer of the Quigleys.

The answer filed by the Quigleys and the motion to strike said answer filed by the Government raise the following issues:

1. Should the order granting possession of the subject property to the government be set aside and reversed because of an inconsistency between the proposed use of the property and the authority for the taking, as set forth in the Complaint and Declaration of Taking, and the actual intended use of the property by the Government?

2. Do Mr. and Mrs. Quigley have a sufficient interest in the subject property to be entitled to damages because of the taking thereof by the Government?

3. What is the proper measure of the damages sustained by the Elk Forest Civic Association from the taking of the reserved five foot strip?

The factual background giving rise to the present dispute is virtually agreed upon by the parties.[1] Sometime prior to July, 1946, the United States Government condemned the property known as Welch's Point located between the Elk River and Back Creek near Chesapeake City, Cecil County, Maryland, for use as a soil dumping area in connection with the widening and deepening

---

1. Here the court recites almost verbatim from the facts as set forth in the brief of the Quigley defendants, which facts "at pages 1, 2 and 3 are hereby adopted [by the Government] as substantially correct."

of the Chesapeake and Delaware Canal. Subsequently, by deed dated July 2, 1946 and recorded among the Land Records of Cecil County in Liber No. R.R.C. 17, Folio 186, 345 acres immediately adjoining the Government property were sold by Florence B. Locke to Kentmore Park Company. On September 25, 1947 the said Kentmore Park Company recorded Plat No. 2 of Elk Forest among the Land Records of Cecil County in Plat Book R.R.C. No. 1, Folio 4. The Plat established several lots lying on the North side of Elk Forest Road. On September 23, 1953, the Company recorded Plat No. 4 among the Land Records of Cecil County in Plat Book R.R.C. No. 1, Folio 74, which established several lots lying on the South side of Elk Forest Road. The aforesaid plats show the Elk Forest Road to be 50 feet wide and they likewise disclose a 5 foot strip reserved at the West end of Elk Forest Road immediately adjoining the property owned by the United States Government. On August 20, 1951, the Kentmore Park Company conveyed Lot 38 lying on the North side of Elk Forest Road immediately adjoining the Government property, to Paul W. Quigley and Eva F. Quigley, his wife, by deed recorded among the Land Records of Cecil County in Liber R.R.C. No. 65, Folio 142. On November 6, 1953, the Kentmore Park Company conveyed Lot No. 231 which immediately adjoins the Government property on the South side of Elk Forest Road to Connor-Quigley, Incorporated by deed recorded among the Land Records of Cecil County in Liber R.R.C. No. 100, Folio 358. On March 8, 1966, Quigley Mortgage Service, Inc., the successor in interest to Connor-Quigley, Incorporated, conveyed Lot No. 231 to Paul W. Quigley and Eva F. Quigley, his wife. At the present time, Mr. and Mrs. Quigley are the owners of the lots on both sides of Elk Forest Road immediately adjoining the Government property at Welch's Point. On October 16, 1953 when negotiations for the purchase of Lot No. 231 were underway, Mrs. Quigley wrote to the Kentmore Park Company, in which letter she stated that she assumed: "That this deed will include the 5 foot reservation across the public road, which connects Lot #38 and Tract #231." By letter dated October 20, 1953, from the Kentmore Park Company to Mrs. Quigley, she was advised that: "The five foot reservation at the end of Elk Forest Road was created to block an attempt to open the road into the adjoining property and is in no way affected by division of the ground on the south side of the road." On June 15, 1957, by deed recorded among the Land Records of Cecil County in Liber W.A.S. No. 124, Folio 215, the Kentmore Park Company granted and conveyed to the County Commissioners of Cecil County a right of way over Elk Forest Road for the purpose of the construction, improvement and maintenance of said road. The State Roads Commission thereafter constructed a hard surface road along Elk Forest Road, which hard surface road dead-ended at the Quigley property line leaving approximately 125 feet between the end of the hard surface roadway and the reserved 5 foot strip. By deed dated June 20, 1966, and recorded among the Land Records of Cecil County in Liber W.A.S. No. 194, Folio 169, the Kentmore Park Company, having sold all of the lots in the development, conveyed to the Elk Forest Civic Association, Inc. the " '5 foot strip reserved' at the West end of Elk Forest Road as shown on the plat of Elk Forest, Plat No. 2, recorded among the Land Records of Cecil County in Plat Book R.R.C. No. 1, Folio 4." The Elk Forest Civic Association, Inc. is a non-profit, non-stock corporation. Almost all of the Elk Forest lot owners, including Mr. and Mrs. Quigley, are members of the Civic Association. The 5 foot strip reserved at the end of Elk Forest Road and a similar 5 foot strip reserved at the end of the South Shore Road, also in the Elk Forest development, are the only properties owned by the Association.

The United States Government filed the pending condemnation suit for the condemnation of a perpetual and assign-

able easement and right of way in, on, over and across the aforesaid 5 foot reserved strip for the location, construction, operation and maintenance of a road and appurtenances thereto. Mr. and Mrs. Quigley and the Elk Forest Civic Association among others were named as defendants in the condemnation suit and a sum was deposited with the court as the value of the property being taken. The notice served upon Mr. and Mrs. Quigley recited that the land was being taken "for use in connection with the Inland Waterway, Delaware River to Chesapeake Bay, by the Corps of Engineers of the Department of the Army."

The Complaint joined as additional parties defendant "unknown owners". It cited as authority for the taking 40 U.S.C. § 257, 16 U.S.C. § 715, 40 U.S.C. § 258a, 16 U.S.C. § 715k–5 and 64 Stat. 595 and 693 "and all other acts or parts of acts supplementary thereto or amendatory thereof."

The Declaration of Taking which is signed by the Secretary of the Army of the United States of America, on the other hand, recites that the property is being taken under the authority of 40 U.S.C. § 258a "and acts supplementary thereto and amendatory thereof"; 33 U.S.C. § 591 and 33 U.S.C. § 594 authorizing the acquisition of land for river and harbor purposes; and also pursuant to the authority of public law 780 of the 83rd Congress, 68 Stat. 1248, passed on September 3, 1954 which approved the project, and public law 89–689, 80 Stat. 1002, passed on October 15, 1966 which Act appropriated funds for the project.

With respect to the public use for which the property is being taken, the Declaration of Taking recites as follows:

"(b) The public uses for which said land is taken are as follows: The said land is necessary adequately to provide for the enlarging and straightening of the Chesapeake and Delaware Canal, and for other uses incident thereto. The said land has been selected by me for acquisition by the United States for use in connection with the Inland Waterway, Delaware River to Chesapeake Bay, and for such other uses as may be authorized by Congress or by Executive Order."

The Government does not dispute the fact that the real purpose of the taking was to provide public access to a proposed public recreation facility at Welch's Point.

Nor does the Government controvert defendants' statement that subsequent to the filing of the condemnation proceeding, the Corps of Engineers promptly proceeded to cut down trees, etc. and construct a roadway along the right of way of Elk Forest Road, over the approximately 125 feet connecting the previously existing hard surface roadway and the Government property at Welch's Point. Once the roadway was constructed, the public began to congregate at Welch's Point despite the lack of any recreational or rest room facilities and the resulting use of the property constituted a nuisance to the adjoining owners as well as a health hazard. After many complaints, by said owners, the Corps of Engineers finally closed off public access to the property pending the construction of the proper facilities for use of the area. (See letter from Mr. Woodrow Berge, Director of Real Estate of the Department of the Army to Honorable Clyde O. Martz, Assistant Attorney General, Department of Justice, attached as Exhibit "A" to reply brief of defendants Quigley).

Under these facts the Quigleys contend that the Order granting possession of the property to the Government should be set aside and reversed since the Government's intended use of the property is other than is stated in the Declaration of Taking by the Secretary of the Army and other than is authorized by the cited Statutes, and as there has been no Declaration and citation of authority filed by the Secretary of the Interior requiring the use of the property for access to a public park. In the alternative, should this court confirm

the Government's taking, Mr. and Mrs. Quigley contend that they are proper parties to this proceeding, and are entitled to substantial damages because of the decrease in market value to their property as a result of the Government's taking, or, if they as adjoining property owners are not entitled to damages in their own right because of the taking of the reserved five foot strip, then, defendant, Elk Forest Civic Association, as the representative of the property owners in the development, should recover damages for the loss of the 5 foot strip, such damages to be measured by the combined total reduction in market value of all of the property owned by members of the Association.

Turning first to a consideration of whether or not the taking of the 0.01 acre of land herein involved as an access to Welch Point, which Point is to be used as a recreational area, has been duly authorized by Congress in connection with the development of the Chesapeake and Delaware Canal Project and a consideration of whether or not the complaint and the Declaration of Taking properly and adequately set forth a statement of the authority under which, and the public use for which, the land was taken, it should be initially noted that the Government concedes that the original complaint (but not the Declaration of Taking) was erroneously drawn to list incorrect statutory authority for the taking. The complaint was subsequently amended, as permitted by Rule 71A(f), F.R.C.P., 28 U.S.C. to conform with the allegations of the Declaration of Taking. A copy of the amendment was served on the Quigley defendants.

Title 40 U.S.C. section 258a establishes a procedure whereby the Government can take possession of property which it is condemning, prior to the final determination of the amount payable to the property owners. It provides that "a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition" must be filed. Among the requirements to be set forth in said Declaration of Taking is "(1) A statement of authority under which and the public use for which said lands are taken." The Declaration of Taking in this case was signed by the Secretary of the Army of the United States and it as well as the amended complaint sets forth that the taking of the property was pursuant to 33 U.S. Code, sections 591 and 594, which sections authorize the Government to acquire lands for river and harbor purposes. The Declaration of Taking further recites that the land taken was "necessary to adequately provide for the enlarging and straightening of the Chesapeake and Delaware Canal, *and for other uses incident thereto.* The said land has been selected by me [Secretary of the Army] for acquisition by the United States for use *in connection with* the Inland Waterway, Delaware River to Chesapeake Bay, and for *such other uses as may be authorized by Congress or by Executive Order.*" (Emphasis supplied).

The Government originally acquired that part of land known as Welch Point by condemnation proceedings instituted in 1937, pursuant to the River and Harbors Act of 1935, Public Law 409, 74th Congress, approved August 30, 1935, 49 Stat. 1028, for use as a disposal area in connection with the operation and maintenance of the Chesapeake and Delaware Canal, Inland Waterway. A modification of this canal was authorized under the River and Harbors Act of 1954, Public Law 780, 83rd Congress, approved September 3, 1954, which latter authorization provided for deepening and widening of the canal. Section 209 of this Act, 60 Stat. 642, 16 U.S.C. § 460d authorized the Chief of Engineers to construct, maintain and operate recreational facilities in *reservoir areas* under the control of the Department of the Army and to grant leases of such land, giving preference to federal, state or local governmental agencies. This provision was amended by Public Law 87–874, 76 Stat. 1173, enacted October 23, 1962, 16 U.S.C. § 460d, and the words "water resource development areas"

were substituted for "reservoir areas" wherever appearing in the original statute. This amendment was supplementary to section 209 of Public Law 780 and was in full force and effect at the time of the declaration of taking filed in the instant case. Said amendment provides as follows:

"Section 4 of the Act entitled 'An Act authorizing the construction of certain public works on rivers and harbors for flood control, and for other purposes', approved December 22, 1944, as amended by section 4 of the Flood Control Act of July 24, 1946, and by section 209 of the Flood Control Act of 1954, is hereby further amended to read as follows:

'The Chief of Engineers, under the supervision of the Secretary of the Army, is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army,* to permit the construction of such facilities by local interests (particularly those to be operated and maintained by such interests), and to permit the maintenance and operation of such facilities by local interests. The Secretary of the Army is also authorized to grant leases of lands, including structures or facilities thereon, at water resource development projects for such periods, and upon such terms and for such purposes as he may deem reasonable in the public interest:

\*    \*    \*    \*    \*    \*

'\*  \*  \* The water areas of all such projects shall be open to public use, generally, without charge, for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such areas along the shores of such projects shall be maintained for general public use, when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the*

*Secretary of the Army may deem necessary.'*
\*    \*    \*  "

(Emphasis supplied).

The 1962 amendment did not define the difference between "reservoir areas" and "water resource development areas." However, in 1964 section 460d of Title 16, U.S.C., was again amended and the legislative history of the 1964 amendment is enlightening. In Senate Report No. 1364, 2 U.S.Cong. and Adm.News 1964, page 3640, a reference is made to "such water resources development agencies as the Corps of Engineers." The court, accordingly, concludes that the Chesapeake and Delaware Canal Inland Waterway from Delaware River to Chesapeake Bay is a "water resource development" within the meaning of section 460d of Title 16, U.S.C., as amended in 1962, and that land taken in connection therewith may be used for the construction of recreational facilities and ready access to and exit from such facilities maintained for general public use. The Declaration of Taking, while certainly lacking in perfection, constitutes a sufficient compliance with the requirements of section 258a of Title 40 that a statement of the authority under which and the public use for which the land was taken be given in that sections 591 and 594 of Title 33 were relied upon in said declaration and the use was spelled out, although broadly and in general terms, as being a use incidental to the Chesapeake and Delaware Canal Project, a use in connection with the Inland Waterway, Delaware River to Chesapeake Bay, and such other use as may be authorized by Congress or by Executive Order. As was said in Berman v. Parker, 1954, 348 U.S. 26, 35, 36, 75 S.Ct. 98, 104, 99 L.Ed. 27:

\*    \*    \*    \*    \*    \*

"Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and *the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.* See Shoemaker v.

United States, 147 U.S. 282, 298 [13 S.Ct. 361, 390, 37 L.Ed. 170]; United States ex rel. Tennessee Valley Authority v. Welch, supra, 327 U.S. [546] at page 554 [66 S.Ct. 715, 718, 90 L.Ed. 843]; United States v. Carmack, 329 U.S. 230, 247 [67 S.Ct. 252, 260, 91 L.Ed. 209]." (Emphasis supplied).

The reason for the requirement of a statement of the Government's intended use of the property taken is to enable the trier of fact to reach an intelligent conclusion when the issue of just compensation is raised. As was said in 2,-953.15 Acres of Land, etc. v. United States, 5 Cir. 1965, 350 F.2d 356, 360: "Damages reasonably to be anticipated from the use of the property for the purpose for which the condemnation is made are relevant in determining the compensation to be awarded for the taking.[10]", citing in footnote 10: "United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. Chicago, B. & Q. R. Co., 8 Cir. 1936, 82 F.2d 131, 135; United States v. Chicago, B. & Q. R. Co., 7 Cir. 1937, 90 F.2d 161, 167–168; compare Campbell v. United States, 1924, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328; Orgel, Valuation under Eminent Domain §§ 55, 56." Thus it may be seen in the instant case that no one having an interest in the condemned land has been prejudiced by the broad language used by the Government in its statement of intended use as the issue of just compensation still remains to be tried and the actual, specific use proposed for the land in question is a matter of record by way of affidavit filed by Colonel James A. Johnson, District Engineer, United States Army Engineer District, Philadelphia, Pennsylvania, which affidavit states in pertinent part that the condemned land "is required for land access" to Welch Point where a recreational area including a public swimming area is to be developed. Accordingly, this court concludes that the 0.01 acre of land herein involved was properly taken with all of the procedural requirements sufficiently observed and that the order granting

possession of the subject property to the Government should not be set aside and reversed, there being no inconsistency between the proposed use of the property and the authority for the taking, as set forth in the complaint and the Declaration of Taking, and the actual use which the Government intends to make of the property.

■ Turning next to a consideration of whether or not the Quigley defendants have a sufficient interest in the subject property to establish them as proper parties to this condemnation proceeding, counsel for the Quigleys frankly and commendably admit that even if the ownership by the Quigleys of lots on both sides of Elk Forest Road, that is to the north of and to the south of Elk Forest Road, should be held to give them title to the center of Elk Forest Road both from the north and from the south, "nevertheless, since the five foot strip was shown as reserved on the plat, and since the reserved area was never part of Elk Forest Road, we would have to admit that *Mr. and Mrs. Quigley do not have any fee simple title to any portion of the five foot reserved strip which is the subject of this condemnation proceeding.*" (Quoting from Quigley Brief, page 11; emphasis supplied). The brief then continues:

"However, as noted in the Statement of Facts, the reservation of the five foot strip was made for the express purpose of preventing the opening of a road into Welch's Point, and Mr. and Mrs. Quigley *and the other property owners* relied upon this representation when they purchased their lots. *They also are members of Elk Forest Civic Association, which holds title to the reserved five foot strip. Upon dissolution of the corporation, the then members thereof would be entitled to equal shares of the corporate property.* It is submitted that this interest of Mr. and Mrs. Quigley in the property *as members of the Elk Forest Civic Association,* is a sufficient valuable right or interest in the land to entitle them to a share in

any award for the taking of the property." (ibid., pages 11–12; emphasis supplied).

The Quigley defendants as individual members of the Elk Forest Civic Association, a non-profit corporation of the State of Maryland and owner of record of the land herein condemned, give no reason for a piercing of the corporate veil. Accordingly, they cannot stand in the shoes of the corporation in order to recover for *damages accruing to the corporation* from the taking. (See generally: Donnell v. Herring-Hall-Marvin Safe Co., 1908, 208 U.S. 267, 273, 28 S.Ct. 288, 52 L.Ed. 481; Terry v. Yancey, 4 Cir. 1965, 344 F.2d 789, 790; Green v. Victor Talking Machine Co., 2 Cir. 1928, 24 F.2d 378, ˚380–381; Mullins v. First National Exchange Bank of Virginia, W.D.Va.1967, 275 F.Supp. 712, 721–722; E. M. Fleischmann Lumber Corp. v. Resources Corp. International, D.Del.1952, 105 F.Supp. 681).

■ The Quigleys, however, have an alternative approach to the problem of whether or not they have "standing" as parties entitled to compensation and that is, that having allegedly purchased their lots in reliance upon a written representation that the purpose of the five foot reservation was to block an attempt to open a road into the adjoining Government property, they thereby became holders of an implied negative easement and as such are entitled to recover damages for the taking of said easement. Without intimating any opinion as to what the true facts may in the future be found to be, suffice it to say there is authority for the legal proposition advanced by the Quigleys. In 26 Am.Jur. 2d, Eminent Domain, section 174, page 851, it is stated:

"the right to have property *not* used for certain purposes is or may be of value to the person having the power to assert such right, and clearly, property protected by an agreement that other property will not be put to certain uses may be enhanced in value by the existence of the agreement and,

accordingly, is or may be reduced in value when the agreement is abrogated, as by condemnation. Accordingly, in strict logic, it may be argued that since the condemnation deprived the owner of such a 'negative' easement of his rights therein, he should be entitled to compensation for his loss, as for the loss of any other 'property'. It has been so held by a number of courts."

See also A.L.I., Restatement of The Law of Property, section 566, Vol. 5, page 3320 which states: "Upon a condemnation of land subject to the obligation of a promise respecting its use in such manner as to extinguish the interest in the land created by the promise, compensation must be made to those entitled to the benefit of the promise." The subject of the compensability of negative easements in condemnation cases is discussed at some length in an annotation in 4 A.L.R.3d beginning at page 1137 entitled "Eminent Domain: Restrictive Covenant or Right to Enforcement Thereof as Compensable Property Right". In paragraph 1 subsection (a) thereof on page 1139, the annotation states:

"This annotation discusses whether a restrictive covenant or the right to enforce a restrictive covenant is a property right the taking of which necessitates the payment of compensation or damages to those persons entitled to enforce the restrictions where the restricted land is taken or used for public purposes in derogation of the covenant.

"The term 'restrictive covenant,' as here used, includes various interests described as building restrictions, rights in the nature of a servitude or easement, equitable easements, reciprocal negative easements, or equities in favor of adjoining land. In short, the annotation includes all decisions which involve a claimed right to compensation for destruction of a restriction on, or negative requirement as to the use of, particular property."

On page 1140, under Summary, said annotation states:

"Clearly, the right to have property not used for certain purposes is or may be of value to the person having the power to assert such right, and, clearly, property protected by an agreement that other property will not be put to certain uses may be enhanced in value by the existence of the agreement and, accordingly, is or may be reduced in value when the agreement is abrogated, as by condemnation. Accordingly, in strict logic, it may be argued that since the condemnation deprived the owner of such a 'negative' easement of his rights therein, he should be entitled to compensation for his loss, as for the loss of any other 'property.' It has been so held by a number of courts, which represent at the present time (1965) at least a numerical majority of the decisions upon the question."

Accordingly, the court is not prepared at this point to say, *as a matter of law,*[2] that the Quigleys may not have a negative easement in the condemned land and as holders of such be entitled to compensation.

The final issue raised by the briefs submitted by the parties then is the question of the proper manner in which to measure just compensation. The parties agree that the normal and usual measure of damages in condemnation cases is the fair market value of the property taken plus damages to the remainder. (United States v. Miller, 1943, 317 U.S. 369, 374–375, 63 S.Ct. 276, 87 L.Ed. 336; U. S. ex rel. T.V.A. v. Powelson, 1943, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. Petty Motor Co., 1946, 327 U.S. 372, 377–378, 66 S.Ct. 596, 90 L.Ed. 729). The parties further agree that market value is defined as the price which a willing buyer would pay to a willing

seller. However, agreement ends when the Government seeks to invoke the usual measure of damages and the defendants contend that an exception to the general rule applies in the instant case because the land in question has no market value, the five foot reserved strip of land having no conceivable use other than its original intended use as a buffer zone. To the court the following statement from 27 Am.Jur.2d, Eminent Domain, section 28, page 75 offers some elucidation:

"While market value is always the ultimate test, it occasionally happens that the property taken is of a class not commonly bought and sold, as * * * the fee of a public street, or some other piece of property which may have an actual value to the owner but which under ordinary conditions he would be unable to sell for an amount even approximating its real value. As market value presupposes a willing buyer, the usual test breaks down in such a case, and hence it is sometimes said that such property has no market value. In one sense this is true; but it is certain that for that reason it cannot be taken for nothing. From the necessity of the case, the value must be arrived at from the opinions of well-informed persons, based upon the purposes for which the property is suitable. This is not taking the 'value in use' to the owner as contradistinguished from the market value. What is done is merely to take into consideration the purposes for which the property is suitable as a means of ascertaining what reasonable purchasers would in all probability be willing to give for it, which in a general sense may be said to be the market value. The market value, and not the value for such special purpose, or the value to the party seeking to condemn it, is the measure of damages."

---

**2.** It should not be forgotten that the case is presently before this court on the Government's motion to strike the answer of the Quigleys as insufficient as a matter of law.

Obviously, in ruling upon a motion to strike an answer as being insufficient as a matter of law, the court should not and, indeed cannot, as invited by the parties herein to do, determine in a factual vacuum the "proper measure of damages". This issue must await a trial on the merits.

For all of the foregoing reasons the Government's motion to strike the answer of the defendants Quigley to the instant condemnation suit is hereby *granted* as the sole defense raised by them to the taking, i. e. lack of procedural due process, has been ruled upon, as a matter of law, adversely to said defendants. This ruling, however, in no way affects their status as proper party defendants to the instant suit or their right to be heard upon a trial on the merits as to the question of the measure of just compensation; and to participate in the award, if it should be found by this court that their interest as alleged individual holders of negative easements in the condemned land is distinct and apart from the property interest held by the Elk Forest Civic Association in said land. As was said in Atlantic Seaboard Corporation v. Van Sterkenburg, 4 Cir. 1963, 318 F.2d 455, 458:

"Under Rule 71A(e) of the Federal Rules of Civil Procedure, a defendant in a condemnation proceeding may file a notice of appearance, *or, if he has some objection or defense to the taking,* he may file an answer within 20 days of the service of the notice upon him. *If he files no answer, he is entitled to be heard on the question of just compensation and to participate in the award.* The permissive answer is thus specifically designed for the purpose of raising objections and defenses apart from the amount of just compensation." (Emphasis supplied).

Order in accord with the rulings herein made.

